**Terrance LEE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08–93–00096–CR.**

Court of Appeals of Texas,
El Paso.

Dec. 30, 1994.

Robert L. Stevens, Rodion Cantacuzene, Jr., Cook & Cantacuzene, P.C., Midland, for appellant.

Al W. Schorre, Jr., Dist. Atty. of Midland County, Midland, for State/appellee.

Before BARAJAS, C.J., and KOEHLER and McCOLLUM, JJ.

## OPINION

BARAJAS, Chief Justice.

Terrance Renard Lee appeals his conviction for the offense of capital murder. The jury found Appellant guilty, but answered the death sentence special issues in the negative. Accordingly, punishment was automatically assessed at confinement in the Institutional Division of the Texas Department of

Criminal Justice for a life term. *See* TEX. CODE CRIM.PROC.ANN. art. 37.071 § 2(g) (Vernon Supp.1994). We affirm the judgment of the trial court.

## I. *SUMMARY OF THE EVIDENCE*

In July of 1992, Alejandro Rodriguez was employed as a cab driver for City Cab Company of Midland, in Midland, Texas. In the early morning of July 6, 1992, he was found dead behind the wheel of his cab, engine running and headlights burning. An autopsy revealed he died of two gunshot wounds to the head, both fatal and both fired from very close range. Two shell casings were found on the left side of the cab's rear floorboard. Cab company records of the evening's fares indicated Rodriguez should have been carrying $81.60. Although some coin change was found in disarray in the cab, it did not total $81.60. Also missing were the small bills necessary to make change for the usually small fares Rodriguez collected.

Police questioned Appellant on three separate occasions. Midland Police Detective Ronnie Bryant first attempted to contact Appellant in person at his home on August 7, 1992. Appellant was not home and Bryant left word with Appellant's sister that Bryant wished to speak with him and that he should contact Bryant. Later in the day, Appellant's mother, Rose Lee, contacted Bryant and asked him to come to the residence to speak with Appellant. Bryant went to the house alone and asked both Ms. Lee and Appellant to accompany him to the police station for questioning. The Lees complied, driving to the station in their own vehicle, with Bryant following.

Arriving at the station at about 7:00 p.m., Bryant took Appellant upstairs to his office and then to an interrogation room, while Appellant's mother stayed downstairs in the lobby. Once in the room, Bryant informed Appellant he was investigating the murder of a cab driver. Appellant was given the required *Miranda* warnings and specifically told he was not under arrest. Appellant was free to leave at any time during the interview.

At Appellant's request, Ms. Lee was brought to the interrogation room and re-mained for the duration of the session. Ms. Lee repeatedly encouraged Appellant to tell the truth and actually prayed with him. Appellant gave a recorded statement that began about 9:15 p.m. and went on for some 45 minutes. In this statement, Appellant stated that he knew who perpetrated the crime, although he claimed he was not present when Rodriguez was killed. Appellant said he and two other persons, Jeremiah and Bones, discussed the robbery of a cab driver. They then summoned a cab and entered it together. Appellant claimed he exited the cab before any misconduct took place. He then spoke with someone named James, after which he found the cab with Rodriguez's body at the wheel. After the statement, Bryant told Appellant he would likely need to talk with Appellant again in the future. Appellant then left the station with Ms. Lee.

Bryant interviewed James Green and Jeremiah Sims on August 10, 1992. Sims insisted he was uninvolved, claiming Appellant and Green admitted to him that they killed Rodriguez.

On August 11, 1992, after unsuccessfully trying to contact Appellant in person at his home, Midland Police Detective Paul Stroope contacted Ms. Lee by phone to inform her that police again wished to speak with Appellant. At about 3:00 p.m. that day, Stroope went to Appellant's home accompanied by Midland Police Detective Larry Honeycutt, who told Appellant they wished to speak with him at the police station. Appellant asked if the interrogation could take place at his home so his father could be there to help him, but was told it must occur at the station. The detectives transported Appellant to the station in the rear seat of a police vehicle that did not have a cage or other divider between front and rear seats. Appellant was not restrained in the car in any way.

The detectives took Appellant to a third floor interrogation room and *Mirandized* him. Honeycutt then read to Appellant the portion of the Texas Penal Code that defines capital murder and prescribes the punishment therefor. Beginning at 6:20 in the evening, Appellant gave another taped statement, which differed from his first statement.

Appellant stated he had discussed robbing a cab driver with two persons, Jeremiah and Jaime, while at the latter's residence. Appellant personally summoned a cab and instructed it to meet the three actors at a vacant lot. When the cab arrived, all three entered the rear seat and Jeremiah gave the driver instructions. Jaime then instructed the driver to stop and Jeremiah demanded money. As Jaime took the driver's money, Jeremiah produced a gun and shot the driver twice.

The recording of the second statement was interrupted once when Appellant requested a trip to the men's room, to which he was accompanied by Honeycutt. During another break, Appellant visited with Ms. Lee and prayed with her. After the taping, Honeycutt told Appellant he would likely need to speak with him again in the future.

On August 12, after interviewing James Green, Stroope again went to Appellant's residence and left word with his sister. Stroope returned shortly, this time finding Appellant at home. While Stroope waited on the porch, Appellant phoned Ms. Lee and then asked Stroope to speak with her. Ms. Lee asked if Stroope could wait to question Appellant until she was off work so she could accompany him, but consented when Stroope told her the process would require less time if Ms. Lee met detectives at the police station after work. Stroope then took Appellant to the police station. Appellant was not placed under arrest or otherwise restrained during transportation to the police station.

Arriving at the station at about 5:00 p.m., Stroope took Appellant to the third floor, where Honeycutt was waiting. This third interrogation session was largely conducted by Honeycutt, who twice *Mirandized* Appellant before questioning him. Appellant then gave a third recorded statement in which he admitted he killed Rodriguez during a prearranged attempt to rob him. After giving the statement, Appellant visited privately with both of his parents. While Appellant waited at the station at Honeycutt's request, Honeycutt sought and obtained an arrest warrant for Appellant. Shortly after that, Honeycutt arrested Appellant.

## II. DISCUSSION

Appellant challenges his conviction in eight points of error. Appellant directs his first six points of error to the admission of his confession, alleging various procedural infirmities in the manner that it was obtained. These complaints were pressed in a lengthy pre-trial hearing on Appellant's motion to suppress his confession and his two previous statements, which motion the trial court denied in its entirety. In his first point of error, Appellant claims the trial court erred by concluding that Appellant was not in custody when he gave his third statement. In his second point of error, Appellant complains that the warnings given Appellant before he confessed did not comply with Article 38.22 of the Texas Code of Criminal Procedure. In his third point of error, Appellant claims his confession was not voluntary because it resulted from police coercion. In his fourth point of error, Appellant claims he was not allowed to terminate the interrogation session that produced his confession in violation of Article 1, Section 9 of the Texas Constitution. In his fifth point of error, Appellant claims interrogation continued after he made an ambiguous reference to an attorney in violation of the Sixth Amendment to the United States Constitution. In his sixth point of error, Appellant claims the interrogation process generally, together with his lack of understanding of his constitutional and statutory rights, denied him his Fifth Amendment right to remain silent.

Turning our attention to Appellant's first point of error, we observe that Appellant fails to identify the portion of the record wherein the trial court made the finding of which he now complains, namely, that Appellant was not in custody when he gave his third statement. The trial court apparently did not make written findings of fact and conclusions of law, but Appellant lodges no complaint in this regard. The transcription of the suppression hearing does, however, contain an oral finding by the trial court that Appellant was not in custody during any of the interrogation sessions and we presume Appellant directs his first point of error at

this finding.[1]

A trial court has broad discretion in determining the admissibility of evidence and we will not reverse absent a clear abuse of discretion. *Allridge v. State,* 850 S.W.2d 471, 472 (Tex.Crim.App.1991), *cert. denied,* —— U.S. ——, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). On a motion to suppress evidence, the trial judge is the sole and exclusive trier of fact and judge of credibility of witnesses including the weight to be given their testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990); *Cannon v. State,* 691 S.W.2d 664 (Tex.Crim.App.1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986); *State v. Wood,* 828 S.W.2d 471, 474 (Tex.App.—El Paso 1992, no pet.); *Subia v. State,* 836 S.W.2d 711 (Tex. App.—El Paso 1992, no pet.); *Edwards v. State,* 850 S.W.2d 731, 735 (Tex.App.—El Paso 1993, no pet.). In that regard, the trial court was free to believe or disbelieve the testimony of each of the State's witnesses as well as the testimony of Appellant. As an appellate court, we do not engage in our own factual review, but decide merely whether or not the trial judge's findings of fact are supported by the record. If the findings are supported by the record, we are not at liberty to disturb them. Thus, on review, we will only address the question of whether the trial court improperly applied the law to the facts. *Romero,* 800 S.W.2d at 543; *Subia,* 836 S.W.2d at 713; *Edwards,* 850 S.W.2d at 735. Should the trial judge's determination be correct on any theory of law applicable to the case, it will be sustained. *Romero,* 800 S.W.2d at 543; *Edwards,* 850 S.W.2d at 735. This principle holds true even if the trial court gives the wrong reason for its decision, especially when the decision concerns the admission of evidence. *Romero,* 800 S.W.2d at 543; *Dugard v. State,* 688 S.W.2d 524 (Tex.Crim.App.1985).

The trial court did not abuse its discretion by finding that Appellant was not in custody when he confessed to Rodriguez's murder or when he gave either of his two previous statements. The Court of Criminal Appeals set out the controlling principle in *Shiflet v. State,* 732 S.W.2d 622 (Tex.Crim. App.1985):

> We are unaware of any rule of law which forbids lawfully constituted officers of the law from requesting persons to accompany them, or of providing transportation to the police station or some other relevant place in furtherance of an investigation of a crime.... Nor are we aware of any rule of law which forbids one to reject such request. If the circumstances show that the transportee is acting only upon the invitation, request, or even urging of the police, and there are no threats, express or implied, that he will be taken forcibly, the accompaniment is voluntary, and such person is not then in custody. In other words, under those circumstances, such person has not "been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* [384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)].

*Shiflet v. State,* 732 S.W.2d at 628. The evidence of the events surrounding the three interrogation sessions, which we earlier summarized, provides support for the trial court's finding that Appellant voluntarily accompanied the detectives to the police station. He was summoned each time by only one or two detectives. He was allowed to provide his own transportation to the station or was taken there unrestrained in a police vehicle. He was never handcuffed or locked inside a police car. Detectives did not physically seize him or by show of authority or force, such as the brandishing of a weapon, force him to accompany them. Even once at the station, the niceties of voluntary submission to interrogation continued. Appellant was allowed to visit and pray with Ms. Lee periodically. He was allowed to take breaks whenever he requested. He was not interrogated late into the night or for unduly long periods of time. Police testified that Appellant was free to leave at any time during any of the interrogation sessions. In short, Ap-

---

1. Our discovery of the finding is no small feat given that the record of this capital murder trial consists of a two-volume transcript of over 500 pages, and a 30–volume statement of facts spanning more than 3,900 pages. We caution against this practice. *See* Tex.R.App.P. 74(f).

pellant voluntarily submitted to police interrogation until he confessed his crime.

Appellant testified at the suppression hearing to facts that, if believed, would show not only custody, but coercion as well. Appellant urges us to accept as true his version of the events and circumstances surrounding the interrogations. The interrogating officers, however, denied or contradicted Appellant's version and the trial court was within its discretion in favoring the officers' testimony over Appellant's allegations. Because there is support for the trial court's finding that Appellant was not in custody during any of the interrogation sessions, his first point of error is overruled[2]. The validity of the trial court's conclusion that Appellant was not in custody during any of the interrogation sessions obviates the need to address his second through sixth points of error.

 In his seventh point of error, Appellant claims the trial court erred by refusing to include in the jury charge a requested instruction on the lesser included offense of murder. Because murder is a lesser included offense of capital murder, the relevant inquiry is whether there is some evidence that Appellant is guilty of only the lesser offense. *Havard v. State*, 800 S.W.2d 195, 216 (Tex.Crim.App.1990); *Aguilar v. State*, 682 S.W.2d 556 (Tex.Crim.App.1985). A charge on the lesser included offense is required only if there is conflicting evidence

---

2. The State does not dispute that Appellant subjectively thought he had to submit to police interrogation, but argues that his subjective belief is not controlling. The parties here engage in an extended dispute about the controlling legal principles. Appellant urges use of the four-factor test for custody used in *e.g., Melton v. State*, 790 S.W.2d 322 (Tex.Crim.App.1990); *Turner v. State*, 685 S.W.2d 38 (Tex.Crim.App.1985); and *Ancira v. State*, 516 S.W.2d 924 (Tex.Crim.App. 1974). The State claims the four-factor test is no longer valid, noting that the federal Fifth Circuit expressly abandoned this test in *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.1988), *cert. denied*, 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988), and urging the adoption of the more flexible reasonable person test therein announced.

We find the purported conflict in authority overstated because, although we discern at least two lines of authority employing two largely separate modes of analysis, we find that these analytical frameworks have achieved a rather peaceful coexistence, at least for the moment. The State concedes and we agree that the cases Appellant cites are valid Texas authority for the four-factor test. Yet, the reasonable person test comes with an impressive pedigree, which raises many questions about the continued viability of the four-factor test. *See Stansbury v. California*, ── U.S. ──, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (reviewing California Supreme Court's decision that used similar four-factor test and counseling examination of the "objective circumstances of . . . interrogation" in lieu of subjective views of police and defendant); *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984) (announcing that only relevant custody inquiry is whether a reasonable person would have understood that he was under arrest and disavowing significance of whether police had probable cause to arrest). The Court of Criminal Appeals has itself reviewed a custody determination without referring to the four-factor test. *See Shiflet v. State*,

732 S.W.2d at 622 (relying on extent to which investigation had "focused" on defendant); *see also Stone v. State*, 583 S.W.2d 410 (Tex.Crim. App.1979) (employing objective standard). Other courts of appeals have perceived these same two divergent lines of cases and attempted to harmonize them by using an ad-hoc analysis and relying on the factual similarities of prior cases, with varying degrees of success. *See, e.g., Hart v. State*, 818 S.W.2d 430 (Tex.App.—Corpus Christi 1991, no pet.); *Kiser v. State*, 788 S.W.2d 909 (Tex.App.—Dallas 1990, pet. ref'd); *Jolly v. State*, 681 S.W.2d 689 (Tex.App.—Houston [14th Dist.] 1984), *rev'd on other grounds*, 739 S.W.2d 345 (Tex.Crim.App.1987). While the foregoing cases certainly reflect an untidy state of the law, we, as an intermediate appellate court, must take the law as we find it and leave it to superior courts to resolve the conflict the State attempts to define.

Moreover, even if the two analytical frameworks were mutually exclusive, the instant case is not the proper vehicle to attempt to resolve the matter because, as we make clear in the body of the opinion, the sustainability of Appellant's first point of error depends almost entirely on the veracity of the claims he makes about police conduct. The standard of review gives to the trial court broad authority to discredit these statements. This is true even where they were not expressly contradicted by police witnesses, so long as there is some evidentiary reason to question Appellant's claims. The only one of Appellant's claims not expressly contradicted by police witnesses and not otherwise benignly explicable is that Appellant subjectively thought himself required to submit to police interrogation. Thus, even if our conclusion that the two tests coexist were disproved, the trial court could have permissibly emphasized the three other factors of the four-factor test or could have simply employed the reasonable person test, the very terms of which rather obviously render Appellant's subjective beliefs insignificant. In either event, the trial court did not abuse its discretion.

concerning an element of the greater offense that is not an element of the lesser offense. *Royster v. State*, 622 S.W.2d 442, 444 (Tex. Crim.App.1981). In the factual setting of the instant case, the relevant inquiry is whether there is conflicting evidence concerning whether Appellant killed Rodriguez in the course of committing or attempting to commit a robbery. *See* TEX.PENAL CODE ANN. § 19.03(a)(2) (Vernon 1994) (defining capital murder as murder committed in the course of robbery or attempted robbery).

Appellant's confession constitutes some evidence that Appellant killed Rodriguez while robbing him. One of the investigating police officers also provided evidence to this effect when he offered his opinion that Rodriguez was robbed. We now consider whether there exists any evidence that Appellant merely killed Rodriguez, and did not rob or attempt to rob him. Appellant cites conflicting evidence about the amount of money found in the cab and on Rodriguez's person. While the evidence about the amount of money found in the cab is certainly in conflict, there is no conflict over the fact that it was less than Rodriguez should have carried based on the evening's fares. Moreover, the amount of money actually found in the cab and on Rodriguez's person is irrelevant because, even if we accept that Appellant took no money from Rodriguez, there is no evidence to contradict Appellant's admission that he at least attempted to rob Rodriguez. Although Appellant's claim that the jury could have disbelieved his confession is true, it does not lower the threshold of conflicting evidence required to receive a lesser included offense instruction. Because there is no record evidence to contradict Appellant's admission that he attempted to rob Rodriguez, he was not entitled to a jury instruction on the lesser included offense of murder. *Cf. Robertson v. State*, 871 S.W.2d 701 (Tex.Crim.App.1993) (affirming capital murder conviction after examining sufficiency of evidence that defendant killed in the course of robbing **or attempting to rob** victim); *Riles v. State*, 595 S.W.2d 858 (Tex.Crim.App.1980) (affirming capital murder conviction after holding that indictment alleging murder "in the course of committing the offense of robbery" encompasses murder "in the course of ... attempt-ing to commit the offense of robbery"). We therefore overrule his seventh point of error.

■ In his eighth point of error, Appellant claims the destruction or loss of certain evidence denied him due process of law. Appellant filed a pre-trial discovery motion to inspect the cab in which Rodriguez was found. Appellant claims the motion was agreed to by the State, but provides no record evidence to support his assertion. Appellant's specific complaint is that by the time he was allowed access to the vehicle, critical evidence (the vehicle's upholstery and headliner) had been replaced. Appellant claims the lost evidence would have shown the distance and angle of the shooter in relation to Rodriguez and established that he did not kill Rodriguez.

■ The loss or destruction of exculpatory evidence can deny a criminal defendant due process of law. The duty to preserve evidence is limited to evidence that possesses an exculpatory value that was apparent before the evidence was destroyed. *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984); *McDonald v. State*, 863 S.W.2d 541, 543 (Tex. App.—Houston [1st Dist.] 1993, no pet.). Absent bad faith, the mere failure to preserve potentially useful evidence does not of itself result in the denial of due process. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988); *Ex parte Brandley*, 781 S.W.2d 886, 894 (Tex. Crim.App.1989), *cert. denied*, 498 U.S. 817, 111 S.Ct. 61, 112 L.Ed.2d 35 (1990). Such a failure in combination with other factors can, however, create the cumulative effect of a denial of due process. *Gilbert v. State*, 840 S.W.2d 138, 142 (Tex.App.—Houston [1st Dist.] 1992, no pet.). We therefore examine the totality of the circumstances to determine whether the loss resulted in a trial so lacking in fairness as to offend due process. *Ex parte Brandley*, 781 S.W.2d at 892; *Gilbert*, 840 S.W.2d at 142. To show that the loss of evidence abridged his due process rights, a criminal defendant must demonstrate that: (1) evidence was lost or destroyed by the State after a request therefor; (2) the evidence was favorable for the defendant; and

(3) the evidence was material. *Nastu v. State*, 589 S.W.2d 434, 441 (Tex.Crim.App. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980). A showing that the evidence might have been favorable does not meet the materiality standard. *McDonald v. State*, 863 S.W.2d 541, 543 (Tex. App.—Houston [1st Dist.] 1993, no pet.); *Hernandez v. State*, 867 S.W.2d 900, 908 (Tex.App.—Texarkana 1993, no pet.).

Evidence on the matter was adduced at a hearing on Appellant's motion to dismiss the indictment. Testimony at the hearing established that the cab's upholstery and headliner were not preserved. They were replaced sometime before Appellant was given access to the vehicle. Eventually the car was returned to the cab company, which, in turn, gave the car to Rodriguez's mother. Appellant's expert witness testified that had the material been available he would have performed two tests, a Geiss test to detect the presence of nitrates, which are a residue of incompletely burned gunpowder, and a sodium rhodizonate test, which detects traces of vaporized lead. The expert testified that these are simple tests, commonly performed by many crime laboratories.

Significantly, Appellant expressly avoids alleging bad faith on the part of the police. Thus, the relevant question is whether the investigation and resulting trial were so flawed that Appellant was denied due process of law. One requirement in this branch of analysis is that the lost evidence possesses a known exculpatory value. *California v. Trombetta*, 467 U.S. at 489, 104 S.Ct. at 2534. Appellant alleges the evidence would have been exculpatory, but concedes that he cannot prove the character of evidence he cannot obtain. Although it might seem an onerous burden to require Appellant to make such a showing, *Trombetta* clearly requires it. *See also Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (holding State's good or bad faith irrelevant when lost evidence is favorable to defendant); *cf. Arizona v. Youngblood*, 488 U.S. at 57–58, 109 S.Ct. at 337–38 (distinguishing between demonstrably favorable evidence and potentially useful evidence, and explaining that bad faith require-

ment for latter is partially explained by need to limit police obligation to preserve evidence to those cases where their conduct indicates the evidence is exculpatory). Because Appellant does not allege bad faith and because he concedes he cannot establish that the lost evidence would favor him, we overrule his eighth point of error.

Having overruled Appellant's salient points of error, we affirm the judgment of the trial court.